RECEIVED

JAN 2 9 2015

DEBORAH S. HUNT, Clerk

## UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

No. 14-3601

JAVIER LUIS,
*Plaintiff - Appellant*

v.

JOSEPH ZANG, et al.,
*Defendants*

and

AWARENESS TECHNOLOGIES,
*Defendant - Appellee*

On Appeal From The United States District Court For
The Southern District of Ohio
Hon. Susan Dlott
Case No. 1:12-cv-629

**Appellant's Reply
By Javier Luis**

Javier Luis,
*Plaintiff-Appellant*
*Jdlgateway@gmail.com*

i

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure and Sixth Circuit Rule 26.1, Plaintiff-Appellant Javier Luis certifies that he is an individual, is unaffiliated with any publicly owned corporation, and is unaware of any publicly owned corporation that is not a party to this appeal which may have a financial interest in the outcome of the appeal.

Dated Jan 26, 2015.

Javier Luis

## ISSUES PRESENTED

1.      Whether the Lower Court erred with its granting of Awareness' motion to dismiss?

2.      Whether the Lower Court found that Awareness intercepted as defined in the Act?

3.      Whether the "contemporaneity" requirement of Intercept applies to electronic communications?

4.      Whether the Lower Court's application of the "router-switching analysis" in determining that an interception occurred was proper?

5.      Whether Awareness knew or should have known the illegality of the communications it had acquired, used and delivered?

6.      Whether §2520 confers standing on plaintiffs for violations of the ECPA rather than limiting the class of defendants?

7.      Whether 18 U.S.C. section 2520(a), as amended in 1986, provides a private right of action against persons who possess devices of intercept in violation of 18 U.S.C. section 2512(l) (b) in the presence of actual intercept, use or delivery of the information?

8.      Whether the Lower Court erred in its granting of blanket immunity to Awareness for the illegal use by third parties of their product in the exact manner Awareness marketed its device to be used?

9.      Whether the Lower Court erred with its striking of Appellant's Amended Complaint?

10.     Whether the lower court abused discretion by supporting all subsequent reports on its finding of futility of the pleadings?

11.     Whether the Lower Court erred with its denial of leave to amend the pleadings?

12.     Whether the lower court proceedings represented a manifest injustice and denial of Appellant's Due Process rights?

## INTRODUCTION

Awareness Technologies' ('Awareness' or Tech') Answer Brief ('Brief') mostly repeated its earlier arguments, advocating that this Circuit cling to old standards of interpretation of the Wiretap Act ('FWA' or 'Act') and it's 1986 ECPA (interchangeably with the 'Act') update's civil facing statute, '§2520'. Tech urges this Circuit to reject the lower court's finding as to its product's intercept, and maintain the status quo; where an "intercept" under the Act is all but impossible. The Brief again shifted focus from *Tech's role* in the intercepts, onto *Web Watcher's* (or 'WW') *role*— much as it had successfully done in the lower forum. Tech keyed on three main arguments; A) standards applicable to *pro se* filers were properly applied by the lower court ('LC'), B) software manufacturers cannot be held liable under the Act (or any cause of action) for the use of their product by their clients and C) the LC found that no "intercept" occurred under the Act.[1]

As to the application of proper standards, this case presents future jurists and legal professionals with a cautionary tale. The LC used an extreme level of discretion unknown to Appellant (or 'AP') wherein it denied him even one chance to address the phantom "deficiencies" of the pleadings during its single-handed defeat of this case. Few appeals courts in this nation could possibly find that the lower proceedings represented anything but a complete failure of due process.

---

[1] The fact that §2511 was never once cited by the LC cast legitimate doubt on any of the findings therein, and so AP had been in contact with Tech concerning this issue. Both parties agreed that AP would include the issue in his Brief, thereby allowing Tech to properly raise the issue in appeal in its response brief. However, various personal issues, including a last minute glitch caused AP to submit the wrong outline version of the Brief. Not only were cites missing, the "intercept issue" was also not included. Thus it is AP's fault, and not Tech's, that the "intercept" issue for the first time here.

Tech's second major argument, that manufacturers cannot be held responsible for the acts of third party users is neither supported by liability/negligence theories, nor the Act itself. Moreover, any such immunity–even if available to some sellers–can _never ever_ apply to Tech due to its strategic marketing of its product for the precise illegal use that brought about this case.

Tech included a minor argument proposing that this Circuit view this _pro se's_ complaint as if filed by a practicing lawyer. (Brief at 14). Such a claim is patently ridiculous given that AP never even took the Bar, has not worked for an attorney since 1993–and even then part time and only for a few months–and the Complaint was written by a man who last picked up a legal textbook, perhaps _never_ (due to a learning disorder that negated typical study patterns). The Complaint Tech would have this Circuit hold AP to was basically a mishmash of similar lawsuits found on the Internet, and cannot seriously be colored as professionally written by any stretch of the imagination.

## REFUSALS

For whatever reasons, Tech declined to address most of the critical issues raised in the case and in AP's Brief (or 'APB') as follows[2]; 1) Perhaps taking its cue from the lower court, Tech avoided any mention of §2511, neither addressing its "acquisition, "use" _or_ "delivery" of AP's communications in the lower proceedings, nor in its Brief. All three elements were alleged during the lawsuit, either in the Lead or in the rejected amendments. Tech's delivery (or disclosure) was alleged in all three complaints, and yet Tech has never addressed, acknowledged nor even _contested_ its disclosure of his

---

[2] Given Tech's problems with its schedule as reflected in it's motions for leave, it seems only proper for AP to agree in advance not to oppose any supplemental filing by Tech intended to address the omitted issues, contingent on a grant of sur-reply.

communications. Tech also 2) avoided AP's contention in the lower proceedings and in his APB that the high tech company should have and could have easily *known* the illegal nature of the communications it was acquiring, summarizing, and delivering, (APB at *9), or 3) that it could have ameliorated the damage had it taken cheap and easily achieved safety measures common in the industry. *Id.* at*10. Tech also 4) ignored AP's claims in his Lead and in the APB that it had participated to such a high level in the actual intercepts that it should be deemed a co-partner with its criminal users. *See e.g.* APB at*7, 24. Song and dance aside, Tech *did* "intercept" his communications and it further committed all separate sub-violations of §2511. In fact Tech did so with his communications hundreds–if not thousands–of times.

Of critical importance, Tech continued to be elusive about the timing of WW's intercepts. As noted by the Magistrate Court ('MC', interchangeably w/ LC) in its Report and Recommendation ('Report', 'RR', or 'RR1')  the affidavit filed by Tech's CEO was "wholly silent regarding *when* WebWatcher forwards the recorded information to the secret account." (RR *ID 760). (emphasis mine). The APB also claimed WW immediately forwarded the intercepts, as if in real time. (APB at*23). As expected, Tech did not truly address that concern, instead 5) Tech again issued a half-truth meant to throw this Court off focus, concerning the speed of its intercept and transmission thereof to Tech's servers where there are acquired by the company. Tech stuck to the familiar story that users could review the intercepts "at a later date." Of *course* they can, it is still a free country. But how *quickly* can they review it? ***Immediately.*** Unfortunately, if not for the LC's effective blocking of discovery against Tech, this "mystery" could have been solved long ago. Make no mistake, Tech acquires the data on their servers almost

3

instantly and so Tech "intercepts" even if this Circuit somehow chooses to be guided by the ludicrous and draconian "contemporaneous" standard of intercept ('CSI'). Obviously timing of intercept and transmission is a topic Tech does not ever want explored– not in the lower proceedings, and surely not here. Nonetheless, arguably the timing of transmission of the data and availability of intercepts remains a red herring issue. Tech's software *captures* the communications as it is typed or before it even gets to the intended recipient, wherein the information is sent at light speed to Tech's own servers—immediate by anyone's definition. Tech also 6) neglected to address AP's Title II ('SCA') allegations. Even when intercepts do not trip the FWA, they can be seen as violating the SCA. In a recent case within this Circuit, while discussing the various different types of emails defendants could have accessed (i.e. 1. Not yet received, 2. Received but unopened, 3. Received but opened) the court recognized that out of the voluminous number of intercepts that the defendants improperly accessed, at least some of those were accessed by defendants before the plaintiff had a chance to do so. At least in those instances, if nothing else, there was an SCA violation. *Lazette v. Kulmatycki*, 3:12CV2416 (N.D. Oh. June 5, 2013). Finally, 7) the Brief again sidestepped AP's contention that the MC's granting of blanket liability to Tech similar to those granted to the gun industry was wholly inapplicable to a software manufacturer that openly advertises its product for illegal use. Tech's failure to respond substantively to these arguments is not due to a lack of effort–rather no adequate response is available.

## ARGUMENT

## A. THE BITTERSWEET

4

## 1. The Lower Court Did Find That An Intercept Had Occurred

In sharp contrast to Tech's argument to the contrary, (Brief at 17,18) the MC **did find** that an intercept *had* occurred, (RR at PID 761) but it then turned around, switched tact, and applied outdated and dangerously narrow standards of interpretation to §2520. However, the proper ruling was no little feat, as most US courts have inexplicably relied on a standard of intercept established within a case emanating out of the 5th Circuit that neutered the ECPA back in 1994,[3] but that had its roots in another 5th Circuit decision ruled on almost two decades earlier.[4] AP understands the legal system's collective confusion, as the ECPA is a notorious statute, perhaps among the most infamous and complex of all-time. One of the problems has to do with how the statute has been approached, as most courts and scholars have focused only on one title of the ECPA rather than on both the relevant titles (I and II) as an integrated whole.[5] Also, lacking evidence to the contrary, the LC evidenced exactly the kind of phenomenon scholar Orin Kerr has identified as a root cause of the Act's notorious reputation for the past three decades or so, due to its tri-purpose design ('TPD'), in that that most statutory privacy laws generally serve three different functions at once; 1) impose criminal punishment for the violation of privacy, 2) allow civil remedies against those who invaded their privacy, and 3) enact a code of criminal procedure that allows the government to legally invade privacy once a court order is issued. Kerr, Orin S., *The Perils of Interpreting Statutes With Multiple Remedial Schemes: A Comment on the Dicta in United States v. Szymuszkiewic.* Volokh Conspiracy.com, Sept. 10, 2010. Due

---

[3] *Steve Jackson Games, Inc. v. Secret Service*, 36 F.3d 457 (5th Cir. 1994)
[4] *United States v. Turk*, 526 F.2d 654, 658 (5th Cir. 1976)
[5] Leonard Court, Courtney Warmington, *The Workplace Privacy Myth: Why Electronic Monitoring is Here to Stay*, 29 OKLA. CITY U.L. REV.15 (2004) at* n.10.

to the general structure of such laws, the problem is realized because judges often have very different instincts when interpreting criminal statutes, civil statutes, and codes of criminal procedure. *Id.* Sound statutory interpretation requires understanding all of the remedial contexts, and how they work together: Otherwise a judge will confidently interpret the statute based on the assumptions of one remedies scheme in ways that are clearly mistaken (and create very odd result results) in the other contexts. *Id.*

The MC's errors in applying a narrow interpretation to this privacy case where both the victim *and* the offender were intended by Congress to be protected and punished by the Act evidenced exactly the kind of TPD-influenced errors and odd result revealed by Professor Kerr discussed above. Seemingly the LC's instincts in applying narrow standards to criminal statutes overrode its tendency to embrace broader approaches to *civil* actions, as evidenced by its rejection of the narrow "contemporaneous" standard of intercept in favor of the broader "router-switching" analysis in the first part of the report. The MC seemed to confuse the codes of procedure and applicability of standards among the criminal side and civil side of the ECPA, having applied a narrow interpretation and criminal standards of scienter when it *should* have applied a broad interpretation of §2520—an approach that has actually the majority in the US since 2003 or so—which views the statute as providing standing, not limiting the class of defendants. In looking at this case, and that concerning the gaggle of DirecTV cases, one can see very little difference in approach, although all DirecTV cases evidence a more thorough examination of §2511, and more complete exploration of §2512; the exact opposite of what one would expect as the Act was drafted with privacy in mind, not satellite signals or corporations.

## B. THE PATENTLY BAD

**1.    The Filing Standards Applied To This Case Are Unprecedented, Unsupportable, And Run Counter To The Federal Rules.**

In the proceedings, the MC 1) *intentionally* ignored allegations central to the action 2) refused to recognize, directly discuss or cite this intercept lawsuit's *key intercept statute*—§2511—for two years[6], 3) misapplied statutory law to the facts of this case and relied on an improperly narrow interpretation of §2520 4) confused common law scienter requirements between criminal and civil standards while never even discussing the Act's "knowing" requirements, 5) relied on irrelevant case law, 6) intentionally omitted no less than **three** supporting cases that *fully contradicted* its position as to the "universal" rejection of §2512 liability within this Circuit, 7) ignored pleading standards that compelled it to accept AP's pleadings as true, while instead accepting most of Tech's arguments as true without any independent exploration, 8) advocated for Tech while unethically editing AP's statements to support its rulings, 9) improperly struck one amendment, 10) relied on dubious technicalities to deny another ('Denials'), and 11) falsely characterized procedural issues to support its Denials. Moreover, the Southern District of Ohio's ('SD' or 'SDOH') District Court ('DC, interchangeably with 'LC' or 'SD') 12) added a heavy financial burden by its refusal to accept ('Stall') its MC's RR1 for

---

[6] Indeed, a word search of all the LC's submissions will reveal that the number "2511" was seemingly taboo in the Forum. The LC's Omissions, and refusal to recognize or discuss the *entirety* of §2511 caused the demise of this action. To save space, the primary analytical dysfunction caused by the missing allegations will be referred to as "PAD" ( interchangeably as 'MIA').

**_sixteen months_**.[7] To top it off, the strange handling of the case continues, as the DC only recently accepted one of its MC's reports -- and only *after* AP submitted his Brief.

As with all intentional torts, the intent element for the tort of intrusion upon seclusion is whether the act was one of volition. Here, the intent that matters is that Tech intended to spy on *someone*, and the Complaint sufficiently alleges that Tech's open advertising for illegal use of its product shows that requisite level of intent. Moreover, AP alleged that Tech knew or *should have known* that the intercepts were illegally acquired; a capability almost all high tech companies have had for at least a decade. As fully explored in AP's Amended Objection ('AM-O') (Doc. 118, case # 629)– whose arguments are incorporated herein in their entirety–AP clearly alleged Tech had acquired and delivered his communications to unauthorized third parties; both acts represent separate and distinct violations of §2511. Also the Complaint alleged Tech actively participated in the intercepts during the entire period of illegal activity, forcing it out of its protected aider and abettor shell and into the criminal abuser arena. (AM-O at 6, PID 805).[8] Courts do have a high level of discretion, and a court considering a motion to dismiss may decline to fully explore some allegations - finding them to be mere conclusions that are not entitled to the assumption of truth. However a court may <u>not</u> intentionally ignore validly pled claims - discretion or not.  Inexplicably, the LC *never*

---

[7] The LC also 13) self-supported its Denials with its findings of futility that in turn depended on its Key Omission as well as on 14) an intentionally truncated exploration of §2512. Moreover, the District Court ('DC' interchangeably with 'LC') and 15) blocked attempts at appeals even though the case had been effectively terminated for many months by relying on the un-adopted status of the RR and a stack of improper findings.

[8] Further, in his objections that were later rejected by the DC, AP also argued in detail that Tech used the communications <u>via their summary</u> of every single intercept. Tech delivered those summaries to their criminal users via text alert, or email message in near real time. Those objections were effectively disregarded by the DC when it adopted the entirety of the MC's two relevant reports.

*once* mentioned the MIAs that were pled to in the Complaint even if only to deny them as mere conclusions. More ominously, when AP alerted the LC as to the critical misstep in more than a dozen submissions, the LC ignored the topic for the *next two years!* **Nothing** is more telling than the LC's intentional silence on this matter.

Second, although the MC cited and relied on *Potter v. Havlicek*, 2007 U.S. Dist. Lexis 10677 (W.D. Ohio, 2007) it was less than thorough in its examination of its requirements for liability to attach in *this* altogether different case. In fact, it is likely the MC used its discretion to intentionally truncate its exploration in order to support dismissal. In *Havlicek,* the court noted "Section 2520 is read by courts that have found it to provide a civil cause of action for violation of section 2512 to confer standing on one who has suffered an actual illegal interception, disclosure or use of his or her communications." *Havlicek* at 14.  That aspect of §2512 was not included in the Report, because the SDOH presumably continues to rely on *Flowers v. Tandy Corp.*, 773 F.2d 585 (4th Cir. 1985), an out-of-circuit decision that is not controlling, is not persuasive, and is a slap in the face of the Fourth Amendment and to the SC of 1967. *Flowers* represented the previous majority view until only about 2003. *DIRECTV, Inc. v. Gallagher*, 2004 U.S. Dist. LEXIS 28008 (DNJ 2004) (citation omitted). at *13. *Flowers* is a landmark case which (AP believes) is a dangerously outdated and tragically narrow interpretation of §2520 whose inexplicable appeal to courts around the country has been the major cause of the "neutering" of civil ECPA for decades. However, in arguing that the ECPA contains no private right of action for violations of §2512, the MC made three crucial and intentional omissions. First the court never even mentioned the opposing view of that debate, nor did it explore the well-known and notorious split in the

9

country's courts concerning whether §2520 applies to alleged violations of §2512. As far as AP knows, the Sixth Circuit has not ruled on that question, however all of the cases cited by the MC (RR at PID 763 ) as well as Tech (Brief at 5) either directly or indirectly rely on *Flowers. See DirecTV, Inc. v. Treworgy*, 373 F.3d 1124, 1128 (11th Cir. 2004) (relying on *Flowers*); *Luis v. Zang*, 2013 U.S. Dist. LEXIS 29288 at *27-28 (S.D. Ohio Mar. 5, 2013) (citing cases relying on *Treworgy*).  Second, the MC failed to mention that *Flowers* is no longer the majority view; instead, "the recently developed majority view of § 2520(a) is that the statute . . . confers standing on plaintiffs for violations of the ECPA" rather than limiting the class of defendants. *See DIRECTV, Inc. v. Gallagher* at *17 Thus, "[a]nyone who violates a provision of the ECPA is a potential civil defendant." *Id.* at *18. Therefore, under the new majority AP *is* entitled to bring a civil cause of action for violation of Section 2512 of the ECPA.

Nonetheless, the Ninth Circuit more recently distinguished *Treworgy* in a case that alleged more than mere possession. See DIRECTV, Inc. v. Webb, 545 F.3d 837 (9th Cir. 2008). In *Webb* the court noted that–unlike in *Treworgy*–the plaintiff had alleged more than mere possession and had circumstantial evidence that the device was used. As noted above, Tech never even challenged AP's allegations that it did much more than merely possess a device, therefore imparting standing to sue under §2520 as it did in Webb.

Moreover the MC issued a harmful half-truth claiming that courts in this Circuit have **"universally"** held that §2520 provides no right of action for violations of §2512. (RR at PID 762,63). In support of that statement, the MC citied only those cases that have *mostly* denied §2512 claims. However, the MC surely had to know there was *no*

*unanimity* among courts within this Circuit, as there are at least four courts that *have allowed* §2512 claims to be tried by a jury. *See e.g DirecTV, Inc. v. Karpinsky*, 269 F. Supp.2d 918, vacated on other grounds, 274 F.Supp.2d 918 (E.D.Mich.2003)(in denying summary judgment, court found "Under the plain language of 18 U.S.C. § 2520(a), a 'person' may file a civil suit premised on violations of §2511(1)(a) and/or § 2512(1)(b)...if that person's 'electronic communication is intercepted, disclosed, or intentionally used' in violation of § 2511(1)(a) and/or § 2512(1)(b)") at *925,26; *Direct TV, Inc. v. Legans,* No. 03-1071-T, 2004 WL 187323 (W.D.Tenn. Jan. 9, 2004) (agreeing with *Karpinsky* and those courts holding that §2512 provides civil and criminal liability when plaintiff shows that defendant not only possessed an illegal device, but used that device. Since DirecTV did allege that Legans possessed *and* used a device "Plaintiff has stated a claim under 18 U.S.C. §2512") at *7; *Directv, Inc. v. Kimball,* 312 F. Supp. 2d 1043,1046 (W.D. Tenn. 2004) (same). In compliance with the requirements above, AP alleged three violations of different section of §2512 in that Tech 1) possessed, 2) illegally marketed, and 3) sent through the mail, a device primarily useful for intercept of electronic communications. Additionally, AP alleged at least four violations of different sections of §2511, claiming Tech *also* 4) intercepted, 5) acquired, 6) used, and 7) delivered his communications. Altogether, those are *seven* civil ECPA violations that AP alleged throughout the lower proceedings. All of those allegations were pled in greater detail found within the two amendments that were supposedly denied based on the "futility" of the pleadings. However, the Lead Complaint alone alleged all of those elements save, perhaps #3 and #6. *See e.g.* (Lead at PID 326-327,331-332) Nonetheless, Tech's summarization of hundreds of his communications

11

comprises a "use" under *anyone's* definition, and mail delivery is a part of Tech's business model as almost all of its devices are immediately sent via email to its Internet buyers.

Most shocking of all, despite the fact that Tech's possession, marketing, and mailing of a device, as well as its acquisition use and delivery of AP's communications were *never once* challenged by Tech in the lower proceedings (or in its Brief for that matter) the MC found liability could not attach; not under the Act, nor under state and common law claims. This is all the more remarkable when considering that any *one* of those six elements is considered a violation for which many courts allow reach of liability under the ECPA, or under state or common law claims, and two of those elements are near standalone violations (use and delivery) of the Act that are considered to allow reach of remedies under §2520 in many of this nation's courts.

Arguably, although the LC never specifically said so, it *had* found that *Tech* had intercepted, as indicated by the fact that the MC immediately switch over to Tech's liability after having rejected its assertion that no intercept occurred. (RR at 761). However, applying a strange mix of standards, and at least one patently illogical and unfounded theory of liability, the MC found Tech could not be held liable; frankly a finding that goes against all logic and reason.  Also, the LC did not do a proper examination of what the Act meant by the term "intercept" as to liability. Under the Act "intercept" is defined as the "aural or *other acquisition* of the contents" of a communication. 18 U.S.C. § 2510(4) (emphasis added). The term "acquisition" is not defined in the statute, but courts around the country typically apply an "ordinary meaning" to the term. For example, the Ninth Circuit has defined it as the "act of

12

acquiring, or coming into possession of." " *United States v. Smith,* 155 F.3d 1051, 1055 n.7 (9th Cir.1998). It has further held that "[s]uch acquisition occurs 'when the contents of a wire communication are captured or redirected in any way,' " *Noel v. Hall,* 568 F.3d 743, 749 (9th Cir.2009) (quoting *United States v. Rodriguez,* 968 F.2d 130, 136 (2d Cir.1992)).Tech *never once* denied it had acquired AP's communications on its personal servers. And in fact Tech was the first entity to come into actual possession of his communications, as WW does not store the intercepts on the infected computer but rather shuttles or redirects them away instantly in most cases to Tech's awaiting servers. To retrieve the stolen messages, a criminal user has to sign on to Tech's spy account, and Tech then sends them the intercepts. It seems patently odd that a busy court would spend six pages of in depth investigation into finding out if an "intercept" under the Act occurred, and when it did find it did occur, it never specifically identified whoever or whatever "intercepted." Did the Southern District find that an inanimate object was guilty of intercept alone—the Digital Age equivalent of finding "Spike Mike" guilty of the police's intercepts?

Regardless, the LC then found that Tech could not be found liable for (AP asserts) improper reasons. Nonetheless, someone or something was found to have intercepted. The LC did not specifically say it was Tech. Had it done so, AP's Complaint would have been essentially verified, as all he had to do was *allege* any violation of §2511 in conjunction with §2512 to get to liability.

**2.    The Case Law Used By Tech And Relied On By The LC Was Wholly Listless Or Actually Support This Action**

Let us be candid, the case law used against this case by Tech and the LC was irrelevant, laughable, or actually supportive of this action. Excluding the still orbiting relics left behind in the legal system due to DirecTV's four year crusade–which Tech apparently seemed to concede had no proper bearing in a privacy rights case[9] – the cases used by the MC featured a sad trio of cases that cannot support dismissal even in their wildest dreams. In its Brief, Tech urges this Court to embrace the findings of *United States v. Steiger*, 318 F.3d 1039,1047 (11th Cir. 2003) as well as those in *Bailey v. Bailey*, 2008 WL 324156 at *4 (E.D. Mich., Feb. 6, 2008) (Brief at *9,10), By all means feel free to do so. *Bailey* was cited as a court within this Circuit that supported dismissal and *Steiger* is apparently the circuit court authority that all should kneel to. Wrong. Contra to Tech's hopes, neither of those cases are relevant to the present case as the MC already found that they both involved the use of an archaic style of key logger that never entered the stream of commerce, (RR at PID 756), only accessed stored data, and could not be seen to trigger an "intercept" under any definition of the term. Neither supports dismissal here because WW *does* reach out into the Internet and *does* violate the Act. Also, "actual intercept" was present, "use" and "disclosure" went *unchallenged* and Tech participated independently as well as in concert with its criminal abusers during the theft of his communications. Moreover, *Bailey* supports AP's common law claims, because summary judgment was denied for intrusion upon seclusion, and SCA claims were also allowed; both in support of similar claims within this case.

---

[9] In its Response (Doc. 120, PID 838) Tech apparently conceded DTV cases had no proper bearing in a privacy rights case, as they featured a "lesser class" of defendant that congress did not intend to be protected during its drafting of the Act in 1968 or its ECPA update. Although satellite cases were later added under the Acts protection by the courts that does not truly reflect the intent of Congress during its *drafting* of the Act.

The other two cases cited featured an incarcerated serial abuser of the court system–*Searcy v. Microsoft Corp.*, 2005 WL 1153114 at *1 (M.D. Fl. May 4, 2005–and the actual criminal <u>user</u> of the spyware who had the gall to claim victim status with its ECPA claims; *Potter v. Havlicek*, 2008 WL 2556723. Not only did the Mr. Searcy intend to sue Microsoft and America Online in a *class action from prison*, presumably as the "lead attorney", he also wanted to sue everyone in America who worked on computers, libraries, and the Internet.[10] Moreover, unlike the quasi-legal spyware company featured in the present case—an aggressive entity of intercept that preys on our private communications and which Congress intended to **suppress**—Microsoft Inc. is <u>*exactly*</u> the kind of *legitimate* business entity Congress intended its ECPA update to *encourage* onto the Internet, and to be **protected** by the Act. Using *Searcy* to defeat a privacy case insults the intentions of Congress and more importantly, the Supreme Court in 1967.[11] In sum, *Searcy* is little but an embarrassing dead end for Tech as well as the LC, which also cited to a case that relied on *Searcy*. For shame!

Speaking of *that* case, *Havlicek* featured a litigant perhaps more shameless than the less fortunate Mr. Searcy. *Havlicek* suffered from too many problems to properly

---

[10] In all fairness to Mr. Searcy, his complaint and erstwhile "manifesto of Internet injustice" was a surprisingly good read. Although riddled with spelling errors, it was nonetheless `typed on an actual typewriter`–while *in prison* mind you – <u>not</u> on a home computer with *Google Scholar*, *Justia*, and "spell check" at his beck and call.

[11] The majority of the members of the Senate Judiciary Committee took the position that many of the Supreme Court's rulings since 1964 concerning criminal procedure and the safeguarding of individual rights had been a *direct cause* of the escalating crime rate in the United States. S. REP. No. 1097, 90th Cong., 2d Sess.147 (1967) at 41The better question courts should ask is "What was the intent of the Supreme Court in 1967" since, quite frankly, most of congress did not care about privacy, as that Act started off mostly as a bill to increase surveillance. Congress can be seen as having deferred true privacy interests to that Court's decisions.

support dismissal. First, *Havlicek* featured a page and a half of cites to irrelevant DirecTV cases. Second, the plaintiff was the *actual criminal user* of the spyware and lacked standing to sue under the Act. Also, the court applied archaic standards to the meaning of "intercept" that were properly rejected by the MC in the first half of its *own* Report. Additionally, few courts have used such a rigorous interpretation of a "device." Moreover, unlike in the present case, where the lower court intentionally omitted two of the three relevant elements of §2511, Mr. Havlicek **actually did** only plead to §2512 (sending in interstate mail) without having alleged either actual intercept, use or delivery. All in all, *Havlicek* used outdated standards, an improper plaintiff, "DirecTV psychosis" and can *hardly* be seen as properly supporting dismissal of a case featuring a legitimate member of the class of victim the Act was *meant* to protect.

### C. THE UNTENABLE

#### 1. The LC Went Out Of Its' Way To Sidestep Valid Pleadings

During the proceedings and within the AP's Brief ('APB') at least a dozen serious errors by the LC were explored. First and foremost, the LC intentionally ignored allegations within the Complaint pointing to Tech's "acquisition," "use" and "delivery" of his communications. In fact throughout this case Tech and the LC shared much in common; so much so that they can be viewed as one adverse party for the purpose of this appeal ('TLC'). One of TLC's commonalities include the fact that neither ever dared mention "§2511"-facing allegations outside of its "intercept," even then not mentioning the statute directly, oddly referring to it in general terms. While Tech never once mentioned §2511 in its Brief, or rarely in the lawsuit, the LC outdid Tech by never mentioning §2511 in two years within its forum! In and of itself, that easily verifiable *fact*

must surely raise eyebrows within any appeals court familiar with §2520 (or 'civil ECPA'). In fact, other than in the Southern District ('SD' or 'LC'), it is *impossible* to explore §2512 without reference to §2511...***impossible!*** *See e.g. DirecTV, Inc. v. Moreno*, 2003 WL 22927883 (D.N.J.)("...analysis of one [of the statutes] necessarily implicates analysis of the other, and therefore both sections [§§2511,2512] are considered here." at \*3 fn. 7). Another coincidence exists in that the word "delivered" or "disclosed' cannot be found in the Report, nor within Tech's Brief in relation to AP's allegations.[12] A communication is disclosed every time it is played to a third party who has not yet heard it. *Fultz v. Gilliam*, 942 F.2d 396, 402 (6th Cir. 1991). AP's Lead alleged Tech saved his communications for later retrieval by unauthorized third parties;. (Lead at \*PID 387) However, a defendant "need not play the tapes or repeat the conversations to be liable." *Deal v. Spears*, 980 F.2d 1153, 1158 (8th Cir. 1992). Thus CEO Brad and his Board of directors did not have to consciously know what was being recorded. That Tech had recorded, stored, summarized and delivered was more than enough for liability. In fact, Tech disclosed hundreds if not thousands of his messages to unauthorized third parties and Tech's disclosure was pled to in detail in both rejected amendments, which the LC managed to again reject without ever mentioning §2511, or "use" or "disclosure" at all. It seems rather strange that, despite its critical role in this case, there is no mention by TLC of Tech's delivery. Such a synchronized swim between Tech and the LC is ominous because - as far as AP knows - the LC was not a co-defendant in this action against him. When confronted by the omissions in various submissions, the LC issued no response. Why? The reason is obvious; with or without

---

[12] TLC both included the word "disclosed" but only while referring to §2520. Neither ever spoke of disclosure in relation to §2511's violations.

the LC's finding of "actual intercept" by Tech, its disclosure of communications *alone* is a separate violation of §2511. Although the LC missed the primary allegations, it did credit *one* meager §2512 violation in RR1.[13] (RR at PID 762)   Even in courts that prohibit recovery for violations of §2512 alone, many allow liability "in the presence of intercept, use or delivery." *See e.g.* Moreno *2003 WL 22927883, at \*2.* Moreover, when statutes are written in the disjunctive, a party needs prove only one of the factors to meet the statutory requirement. West's A.I.C. 35–33.5–5–4(a); *See also Dommer v. Dommer*, 829 N.E.2d 125 (Ind. Ct. App. 2005)(because phrase "intercepted, disclosed, or used," was written in the disjunctive, plaintiff needed to allege that only one of those three violations occurred.)   Even mentioning the word "disclosure" or "delivery" would have undermined not only the dismissal, but also the denials of amendment due to futility, as well as AP's attempts to "jailbreak" from that forum that was denied due to the LC's dubious coloring of AP's appeal as lacking in good faith[14]. Thus, the likely reason no one will find any mention of those words in any of the LC's submissions in two years.

## 2. Independent Acts Make Tech A Partner In Crime

Crucially, Tech never denied a critical set of "independent secondary acts that add to their liability in the case. In fact Tech 1) independently "used" the data with its

---

[13]Specifically, the LC recognized §2512(1)(c)(ii) (advertising a device) although it ignored §2512(1)(a) *mailing* a device, and §2512(1) (b) *manufacturing* a device. After purchase, Tech typically delivers its intercept device (WW) via the Internet.

[14] The LC's contention that AP could not file an interlocutory appeal *en forma pauperis* was based on the theory that the case was frivolous and not taken in good faith. (Doc. 173, #884, PID 1661). It was only "frivolous" because the LC incorrectly found the case was futile. It was only futile because the LC *intentionally* omitted the allegations in the Complaint that would have made it a viable case. In fact AP lacked not good faith, and the LC that did everything it could not to rule on the outstanding Report for almost a year and a half, so that AP could not appeal a Report that was effectively final, and had been for many months. Good faith *was* surely lacking in the lower proceedings, but it was not this *pro se* who lacked it.

summarizing of the contents of the communications using its automated and state of the art proprietary software that is not a part of the Web Watcher package it sells its clients, and is never in the possession or control of its criminal clients and 2) delivered the summarized contents of intercepted communications automatically, and 3) later (again) delivered the entire contents to unauthorized third parties, this time on demand. All three of the above factors comprise separate violations of §2511; the later two comprising §2511 violations distinct and separate from WW's "intercept"—a function that apparently happens so fast, WW's "storage" of information is almost negligible by human standards, almost "reflecting" the data onto Tech's servers, a digital equivalent of a prism or perhaps a "pellicle mirror." [15]

Additionally, the LC clearly erred in finding that no liability could apply to Tech concerning federal and state wiretap claims and product liability claims when it inexplicably accepted at face value Tech's laughable assertion that it was somehow immune from product liability associated with the use of its product, even quoting Tech's contention that "Smith & Wesson" ('S&W) is not legally responsible for a person's unlawful use of its guns. " (RR at 14, PID 761). However, how does S&W at all apply to Tech's immunity in this case? [16] Claimant will likely never know, since the Court never

---

[15] A pellicle mirror is used in some high-speed cameras such as single lens reflex cameras (SLRs). It is an ultra-thin semi-transparent mirror that splits an incoming beam of light into two separate identical beams, allowing it to achieve multiple purposes at once; allowing the viewer to see the image in his viewfinder, while simultaneously directing the same image into a camera's processor to be copied. Without discovery, AP is uncertain of the mechanism of intercept, as many spyware-makers skirt the FWA by instituting various methods such as in a two-step process that skirts the "in flight" standards typically applied to "intercept."

[16] Presumably rooted in the Protection of Lawful Commerce in Arms Act ('PLCAA') Tech's likely tongue-in-cheek use of the non sequitur axiom was a desperate attempt to shield itself from liability. As previously noted in various submissions in the lower

cited—and Appellant remains unaware of—any analogous statute or relevant case law that bestows upon the spyware industry the same decadent level of immunities granted to gun manufacturers such as Colt, Remington, and of course, Smith and Wesson. Assuming it was merely intended to point toward the principle that a manufacturer cannot be held responsible for the use of its product by a customer, that principle does generally shield manufactures–even those not blessed with blanket immunity by Congress. But in *those* instances the manufacturers must show reasonable measures taken to ameliorate any dangers inherent in its products, and warn of such dangers.

### 3. Corporations and Machines Are Not Exempt

The LC has awarded Tech a new license to intercept our constitutionally protected communications, free and clear of the corporation having to worry about installing any reasonable safety measures, such as a warning banner appearing on a screen. Is it really too much to ask a corporation to take reasonable safety measures when it comes to our privacy? Or in the very least, that it not actively flaunt its criminal activity in the face of the justice system with its illegal advertising?   The court's unquestioning acceptance Tech' claims proved it to be technically naive and plainly in error.[17] In fact a recent murder in England also showed the capabilities of Facebook to automatically monitor, effectively "know" the content and character of information on its

---

proceedings, (*See e.g,*  Doc 118 in #629 at *24-30, PID 823-829; Doc. 175 in #884, at 13-18, PID 1681- 1686), despite its eager acceptance of Tech' assertions of immunity, the MC did not cite to even one case supporting Tech' contentions that it was immune from such liability. As if to further emphasize the weakness of its position, the only case law cited by the Court *supported* manufacturer liability, with the Court's counter-cite of *Gootee v. Colt Industries, Inc.,* 712 F.2d 1057 (6th Cir. 1983).

[17] In fact such capabilities are possessed by most high tech companies, as they use similar software to accurately root out billions of SPAM emails a day. Moreover, companies like Facebook, Yahoo, and Twitter all use artificial language/automated detection of billions of communications on a daily basis.

servers, as well as the associations of that account with other organizations, flag and disable dangerous accounts in the blink of an eye. Further, as noted by Bruce Boyden in 2012, computers, servers and corporations are not immune from violating the Act simply because no one at the company has read, contracted to intercept, or intended to intercept a specific person's communications, but interception requires at least the potential for human awareness of the contents. Boyden, Bruce E., *Can a Computer Intercept Your Email?* (March 26, 2012) at 669. Cardozo Law Review, Vol. 34, No. 2, 2012; Marquette Law School Legal Studies Paper No. 12-05. While Mr. Boyden argues in his article that automated computer processing should *not* count as an "intercept" under the Act, he specifically issued a caveat to his theory in that his conclusion was based on the premise that the automation in question did not produce a record for later human review, *Id.* Such is obviously not the case here. In those cases, Mr. Boyden notes an "intercept" surely has occurred, as follows;

> In recent years it has become feasible for computers to rapidly scan the contents of large amounts of communications traffic to identify certain characteristics of those messages....But the legal status of automated processing, if it is done without advance consent, is unclear. ***Where it results in the disclosure of the contents of a message to others, that clearly violates the federal law governing communications privacy, the [ECPA]***.
> (internal citations omitted) (emphasis mine).

   *Id.* at 667.

   Mr. Boyden was careful to emphasize "recordings [fall] within the scope of the Wiretap Act only on the premise that they enable later human perception of those communications." *Id.* at 698. Thus, a machine with the ability to permanently acquire communications, such as Tech's servers (not WW that does not have a hard drive or space to permanently acquire the data) *can* intercept a communication but only when

the machine preserves a communication for the purpose of later review by a third person. *Id.* at 692. Thus the LC's supposed finding that Tech's infrastructure of intercept could and did intercept, was likely accurate and technically perfect.

AP is uncertain if the LC believed Tech's board had to sit around smoking cigars and reading his communications in order for that corporation to be liable under the Act, although it surely seemed to be the case. However, *Turk,* makes an important point about is often overlooked. *Turk* noted that recording serves as a *substitute* for listening. Bruce Boyden at 690 (*citing to Turk* at 658 n.2.). If a machine can intercept a communication at all, it occurs only when the machine preserves a communication for the purpose of later review by a third person. *Id.* at 691. In the present case, that means as soon as his communications were acquired on Tech's personal servers almost at the very instant they were sent.

The only cases that have found that the Act does not intend to punish corporate entities that acquire communications are those such as *In Re Pharmtrack , Inc. Privacy Litigation* 329 F.3d 9 (lst Cir. 2003). However, *Pharmatrak* found that interception *would be justified* even under the CSI, when a program automatically duplicated part of the communication between a user and intended recipient, and sent the information to a third party, as was the case here, and so it still supports this case even under the most narrow definition of intercept available. *Id.* at 21-22. More importantly, however, *Pharmtrack* made it clear that only *inadvertent* intercepts by corporate entities should be immune from the Act's liability provisions. *Id.* Yet that immunity cannot seriously be applied to this case, where a high tech company *intentionally* targets its intercept mechanism for illegal use, and intercepted his communications for a period of *months,*

not days. Moreover Tech's acquisition of intercepted information was *hardly* incidental. Also, easily implemented, cheap and easy safety measures would have easily flagged such messages,[18] as Tech possesses state of the art interpretive/artificial language software that summarizes each and every intercept, and anyone who believes such a company cannot know the content of its servers has likely never taken a computer class, or worked on computers.[19] In fact, Mr Boyden, above, expounded on the nature of artificial intelligence, and noted "computers can now assist humans to an extent never before possible, not just in compiling and recording data, but in making judgments about that data, and taking the appropriate steps based on those judgments: categorizing messages, filtering out undesirable content, identifying patterns." Bruce Boyden at 672. Nonetheless, the MC seemed to know Tech had the technology, and it did not explore the issue, oddly enough. Instead the LC applied a different set of standards; finding that Tech had to have an agreement with the criminal users, or have known of their intentions to use WW illegally in order to be found guilty under the Act and common law and state claims. (RR at PID 764). That standard is rather unique amongst ECPA cases, as most only require that the defendant did intend to intercept, did come into possession, and used or delivered, knowing or having reason to know

---

[18] In *Playboy Enterprises*, Inc. *v. Frena*. 839 F.Supp. 1552 (M.D. Fla. 1993), a BBS operator whose bulletin board contained copyrighted photographs owned by Playboy was found liable. This was true even though the BBS operator did not make the copies himself, and in fact was never proven to have knowledge of their existence. In effect, this case held the BBS operator liable merely for *providing a means* by which copies (made by others) could be distributed to the public. Although concerning a different area of law, and twenty years old, *Frena* is the wave of the future for ISP operators of all types. ISP's must not be able to use willful ignorance in order to gain advantage in competition, as tech did in this case.

[19] AP will happily entertain any questions concerning Tech's ability to know everything on its' servers at oral arguments.

that the intercepts were illegal. *See e.g. Peavy v. Harman,* 37 F. Supp. 2d 495 (N.D. Tex. 1999)(intent under §2520 is of general intent only, and need not be specifically to violate the particular statute. While the Zang's showed enough intent to satisfy criminal requirements, Tech showed enough to satisfy civil standards. However the LC applied the same heightened scienter requirement to both. For a liability under §2520, as for the commission of torts generally, it would be sufficient for the actor to intend to do the act in question, knowing that the natural consequences of that act are substantially certain to result.) at*510. Tech can never pretend it could not have known the consequences of its business model.

4.    **Standards Were Further Abused In the Court's Strike of a Timely Amendment and in its Denial Of Leave To Amend**

The LC's handling of the case was clearly abusive, and nowhere was this more evident than in the DC's *sixteen-month* stall of its adoption of its MC's Report. However, RR1's orphaned status did not stop it from dominating and bullying the lawsuit as if it were a properly verified order. RR1 ran the entire proceedings as an unloved Article I mall security guard with a chip on its shoulder, its lack of article III validation not stopping it from propping all subsequent reports and orders on its hollow deck. The LC's striking of a timely filed amendment and its later denial of amendment to the pleadings were all based on that orphaned report. In an attempt to cure the supposed insufficiency of the pleadings, AP timely filed an amendment on the filing deadline. However, inexperience led him to file without three magic words "motion for leave" and those three words stalled this case for two more years and fatally wounded the case against Tech. While the decision of whether to strike all or part of a pleading rests within the

24

sound discretion of the DC, striking portions of a pleading is a drastic remedy, and motions to strike are disfavored.   Fed.Rules Civ.Proc.Rule 12(f), 28 U.S.C.A. In *Mechler v. City of Milford,* No. C-1-02-948, 2006 WL 971397 (S.D. Ohio Apr. 10, 2006) at *3, this same DC noted "strike orders have long been recognized as a relatively 'drastic' remedy "'to be resorted to only where required for the purposes of justice." *citing to Mapp v. Board of Ed. Of the City of Chattanooga,* Tenn., 319 F.2d 571, 576 (6 th Cir.1963). In fact, Justice demanded the complete opposite of a strike.[20] Instead, the <u>sufficient pleadings</u> — whose key allegations were intentional omitted by a LC that was surely aware of the key omissions by the time of Tech's motion to strike—should have been allowed to be "cured" by an amendment the LC effectively compelled by its own abuse of discretion.

As a fundamental matter, denial was improper because the case had not been noticed for trial, and discovery was still in a state of extreme flux.[21] As for any potential abuse of the amendment process, that amendment would have only been **the first amendment** Tech would have <u>had</u> to answer.[22]   Leave was not filed on the eve of trial, there was no showing that evidence of the new allegations was unavailable to Tech or that it could not have defended itself on the merits because of the passage of time or due to some action by AP. So there was no per se abuse of the process as to the *lone*

---

[20] Despite ignoring AP's request to be granted leave if the complaint were found lacking, the LC never once informed AP as to his ability to cure the pleadings, despite submissions of inquiry to the LC as to that possibility.

[21] In fact discovery had yet again been postponed, being moved at the time of the filing of leave due to problems with the attorney in the Lead Case. Discovery was eventually advanced to May 30, 2014, <u>ten months</u> later than AP's filing for leave, and *eight* months after the MC denied leave. (Doc. 158, #884, PID 1355).

[22] Despite earlier protests to the contrary, Awareness answered a complaint it should have known was no longer relevant. Thus AP's amendment would have the *one and only* one that Tech would have <u>had</u> to answer.

defendant left in the case at the time of the court's denial. The passage of time of less than a year and a possible complication of the litigation by new facts and new issues was also not "actual prejudice" that would permit a denial of leave. In fact, the LC *never once* stated there was any prejudice to Tech, as there was of course no possibility of prejudice–although it did mention prejudice concerning the *already departed* parties in RR2. That would be odd anywhere else–just not in this particular case.

## CONCLUSION

Tech was clearly found to intercept, but improperly found to be immune from all liability. The Lower court abused discretion throughout the proceedings, intentionally omitted validly pled claims, and undermined the action from the outset, ending with its improper dismissal of the case. This action is valid, and always has been. The case should be remanded so that it may finally proceed towards a trial on the merits.

Dated Jan 26, 2015

Respectfully Submitted,

Javier Luis, Pro Se
4414 W. Minnehaha St.
Tampa, Florida 33614
JDLuis65@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that on Jan 26, 2015 Appellant Javier Luis mailed this appeal to the US Court of Appeals for the Sixth Circuit, as well as an identical copy to Bernard Wharton, counsel for Awareness.

/s/ Javier Luis

26

## CERTIFICATE OF COMPLIANCE WITH RULE 32(A)

This Reply complies with the type-volume and typeface limitations and requirements of Fed. R. Civ. P. 32(a) This Reply was prepared in a proportionately spaced typeface using Microsoft Word Version 11.0 in Arial 12-point font. The Reply relied on line limits instead of page or word limits and the applicable area contains less than 650 lines.

Dated Jan 26, 2015                                    Respectfully Submitted,

                                                       Javier Luis, Pro Se
                                                       4414 W. Minnehaha St.
                                                       Tampa, Florida 33614
                                                       JDLuis65@gmail.com

# DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

*Plaintiff's Amended Complaint, [DOC 39]                    PID## 313-335

*Awareness Technologies Motion to Dismiss    [DOC 68]      PID## 479-492

* Tech's Motion to Dismiss of the July 20, 2012 Lead [DOC 77]   PID## 522-536

* Plaintiffs Sur-Reply To Tech's Reply  [DOC 97-1]         PID## 699-716

* Magistrate's Report and Recommendation (R&R)  [DOC 109]   PID#s  748-765

* District Court Order Adopting R&R   [DOC 162]            PID # 1173

*Plaintiffs Notice of Appeal [DOC. 165]                   PID#1176-1177

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail® shipments. Misuse may be a violation of federal law. This packaging is not for resale. EP14F © U.S. Postal Service; July 2013. All rights reserved.

# PRIORITY MAIL ★

★ MAIL ★

**FROM:**

From JOE
444 W Minnehaha St
Tampa FL 33614

- DATE OF DELIVERY SPECIFIED*
- USPS TRACKING™ INCLUDED*
- INSURANCE INCLUDED *
- PICKUP AVAILABLE
  * Domestic only

WHEN USED INTERNATIONALLY,
A CUSTOMS DECLARATION
LABEL MAY BE REQUIRED.

EP14F July 2013
OD: 12.5 x 9.5

**VISIT US AT USPS.COM®**
ORDER FREE SUPPLIES ONLINE

**UNITED STATES**
**POSTAL SERVICE®**

♲ This envelope is made from post-consumer waste. Please recycle - again.

P S00001000014

---

**PRIORITY MAIL 2-DAY™**

EXPECTED DELIVERY 01/28/2015

U.S. POSTAGE
$5.75
PM 2-DAY
53815  0006
01 728715 $5.75
0006

**P**    0006

SHIP
TO:

Office of the Clerk
Attn: Robin Bishop
US Court of Appeals for Sixth Circuit
540 Potter Stewart Courthouse
100 E. Fifth Street
Cincinnati, Ohio 45202-3988

**CINCINNATI OH 45202-3905**

**USPS TRACKING NUMBER**

9505 5000 1799 5026 0001 97